**In re Laurie Ann SELDEN, Debtor.**

**Bakruptcy No. 389–32535–H13.**

United States Bankruptcy Court,
D. Oregon.

May 18, 1990.

Stephen R. Grensky, Portland, Or., for debtor.

Stephen Tweet, Salem, Or., Daniel H. Rosenhouse, Portland, Or., for creditors.

Robert W. Myers, Portland, Or., trustee.

## OPINION

HENRY L. HESS, Jr., Chief Judge.

This matter came before the court upon the objections to confirmation of the Higher Education Assistance Foundation (HEAF), Hemar Insurance Corporation (Hemar) and the Oregon State Scholarship Foundation (OSSC).

The parties filed a Stipulation of Facts on January 19, 1990. Based upon that stipulation and the evidence presented at trial, the court finds the following facts:

Prior to entering law school the debtor was employed as a bartender. From September, 1984 through July, 1987, the debtor borrowed a total of approximately $42,500 in student loans from the objecting creditors for the purpose of attending law school. She also obtained student loans from other creditors, bringing her total student loan debt to over $55,070.

Despite the burdens of raising two children, the debtor was able to complete her law school education in 1988. She then went to work as a deputy district attorney for Multnomah County. She testified that she had been interested in law enforcement and was pleased to have found this position. Her net monthly income from that position was $1,683 at the time of the confirmation hearing.

All unsecured debt in this case consists of student loans which might not be dischargeable in a chapter 7 case. The proposed plan calls for the payment of 4% to nonpriority unsecured creditors based upon monthly payments to the trustee of $100. An amended budget subsequently increased the monthly net disposable income to $110. The debtor agreed to amend the plan to provide payments for 36 months. The debtor agreed to file quarterly reports of income and expenses. If the debtor's income increases, the creditor or trustee could request modification of the plan pursuant to § 1329. The debtor also agreed to pay the trustee any income tax refunds received during the life of the plan.

The creditors object to confirmation on the basis that the plan was not proposed in good faith as required by 11 U.S.C. § 1325(a)(3). The creditors allege the following facts and circumstances as evidencing a lack of good faith:

(1) All of the debt is student loans, which would be nondischargeable in a chapter 7 case;

(2) The plan calls for a minimal dividend to unsecured creditors and payments will only be made for 36 months;

(3) The debtor either did not intend to repay the loans at the time they were incurred, or recklessly ignored the fact that she would be unable to do so after graduation;

(4) Immediately before filing, the debtor made luxury purchases and otherwise spent money extravagantly;

(5) The debtor intentionally understated income and overstated expenses in her chapter 13 statement.

## THE BURDEN OF PROOF REGARDING GOOD FAITH—IN GENERAL

As stated in *In re Chinichian*, 784 F.2d 1440, 1444 (9th Cir.1986),

> For a court to confirm a plan, each of the requirements of section 1325 must be present and the debtor has the burden of proving that each element has been met.

■ Therefore, the burden of proving good faith, if challenged, falls upon the debtor. Some courts have embellished upon that rule where good faith is challenged, characterizing the burden as "especially heavy" when a "superdischarge" is sought. *See, e.g., In re Warren*, 89 B.R. 87, 93 (9th Cir. BAP 1988) (quoting *In re Wall*, 52 B.R. 613, 616 (Bankr.M.D.Fla. 1985).

■ This court questions the appropriateness of imposing an enhanced burden of proof.[1] The broad discharge provisions of § 1328(a) were obviously enacted for the benefit of debtors, not creditors. It seems incongruous to gratuitously place a handicap upon debtors seeking to take advantage of a provision enacted for their benefit.

That conclusion is consistent with Bankr.R. 3020(b)(2), which provides:

> If no objection is timely filed, the court may determine that the plan has been proposed in good faith and not by any means forbidden by law without receiving evidence on such issues.

If Congress intended debtors to have an "especially heavy" burden in establishing good faith in chapter 13 cases, then a finding of good faith would not be *pro forma* in the absence of evidence indicating bad faith.

This court would have problems applying an "especially heavy" burden of proof when a "superdischarge" is sought. What is the difference between a burden of showing good faith and an "especially heavy" burden of showing good faith? If the debtor has been honest in the answers given to questions contained in the Chapter 13 Statement and answers given to questions propounded by the court and creditors, the plan fulfills all of the requirements of § 1322 and § 1325, and the debtor is not seeking relief other than that prescribed by the statutes, what else must the debtor do to carry the burden of proving good faith? Is it enough that the debtor testifies that the case is filed in good faith and that the plan is proposed in good faith? What additionally must the debtor do to meet an "especially heavy" burden of proving good faith?

The mere fact that the debtor has the burden of proof, without enhancement, can be a hard obstacle for debtors to meet given the lack of any Congressional guidelines and the resultant myriad of conflicting opinions based upon the subjective predispositions of each individual judge. The reported decisions regarding good faith seem to depend more upon the particular judge and his or her personality than upon any particular rule of law.

For the reasons set forth above, this court rejects imposing an "especially heavy" burden of showing good faith where a "superdischarge" is sought.

## THE PERCENTAGE TO BE PAID UNSECURED CREDITORS, THE LENGTH OF THE PLAN AND THE NATURE OF THE DEBT

■ *In re Goeb*, 675 F.2d 1386, 1390 (9th Cir.1982) instructs that while a court "may consider the substantiality of the proposed repayment, the court must make its good-faith determination in the light of *all* militating factors." Many courts have seized upon this and similar language to inquire into the percentage to be paid and the nature of the debts to be discharged in determining good faith. *See, e.g., In re Warren*, 89 B.R. 87 (9th Cir. BAP 1988).

This court believes that the scope of the

---

**1.** This court has stated on numerous occasions that it is not bound by holdings of the Bankrupt-

cy Appellate Panel unless that decision arises

above-cited statement in *Goeb*[2] has been narrowed by subsequent Congressional action, and the amount of the proposed repayment and length of the plan are no longer factors which are properly considered in determining good faith. In 1984, after *Goeb*, Congress amended 11 U.S.C. § 1325 to add subsection (b). That new subsection added a further requirement to confirmation of a chapter 13 plan.

(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan ...

. . . . .

(B) the plan provides that all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

I agree with commentators who have observed that the amendment was intended to eliminate certain factors from the good-faith equation:

The ongoing dispute regarding whether there should be a minimum level of payments in chapter 13, other than that set by the section 1325(a)(4) best interests of creditors test, was resolved by Congress in the Bankruptcy Amendments and Federal Judgeship Act of 1984. That Act added a new section 1325(b) to the Code....

The new amendment thus clarifies that the "good faith" standard of section 1325(a)(3) does not set any minimum amount or percentage of payments that must be made to unsecured creditors, and will allow courts to once again give to the term "good faith" its traditional historical interpretation. 5 King, *Collier on Bankruptcy* ¶ 1325.08 at 1325–46 (15th ed. 1989).

■ Congress has effectively legislated regarding the type of debts which may be discharged, the amount which must be repaid creditors and the length of a plan. Section 1328(a) sets forth what debts are excluded from discharge.[3] Section 1325(b) specifies the method of determining the amount which must be paid to unsecured creditors, and the minimum length of payment.[4] As to those questions, Congress has preempted the field.[5] Courts are not free to judicially overrule the acts of Congress under the guise of an inquiry into "good faith." Those who disagree with the Acts of Congress should appeal to their legislators rather than the courts.

## INCORRECT ITEMS ON CHAPTER 13 STATEMENT

### A. Child Support

■ In her original Chapter 13 Statement, the debtor failed to list as income a

---

from the District of Oregon. *See, e.g., In re Staples*, 87 B.R. 645, 646 n. 1 (Bankr.D.Or.1988).

2. For this court's analysis of the *Goeb* decision, see *In re Castello*, 98 B.R. 523 (Bankr.D.Or. 1989).

3. Congress knows how to limit the dischargeability of certain types of student loans. For example, the discharge of Health Education Assistance Loans is limited by 42 U.S.C. § 294f(g). *See In re Battrell*, 105 B.R. 65 (Bankr.D.Or. 1989).

4. The provision of § 1322(c) which permits a plan to extend for more than 36 months was inserted for the benefit of debtors, not creditors. *In re Gunn*, 37 B.R. 432, 435 (Bankr.D.Or.1984). Therefore, the fact that a plan does not extend for more than 36 months cannot be relied upon by a creditor as indicating lack of good faith. If

Congress intended good faith to require plans paying less than a 100% dividend to extend for more than 36 months, then § 1323(b) would mandate that all plans extend for 60 months or a 100% dividend be paid.

5. For the reasons stated in *In re Adamu*, 82 B.R. 128, 130 (Bankr.D.Or.1988) and herein, this court does not find the dischargeability of a given debt particularly relevant in determining good faith, and therefore need not determine whether the debt would be nondischargeable in a chapter 7 case. In any event, it should be noted that the student loans are dischargeable in chapter 7 to the extent that excepting them from discharge would impose an undue hardship upon the debtor or her dependents. 11 U.S.C. § 523(a)(8)(B). Based upon the debtor's budget, it would appear that even in a chapter 7 much of the student loan debt would be dischargeable.

$100 per month child support obligation from Danny Hayter. She also omitted a $7,200 child support arrearage owed by Hayter. The debtor's explanation for that omission is credible and satisfactory.

She does not know where Hayter lives and has not heard from him in years. At last account, he was a chemically dependent alcoholic facing extradition to another state on felony charges. The debtor sought the assistance of the Support Enforcement Division of the State of Oregon to collect the obligation without success. She does not expect to ever receive anything from Mr. Hayter, and is willing to assign his obligation to the creditors.

The debtor also omitted child support paid by Kim Walter. Mr. Walter's paternity has never been established, and no judgment has been rendered against him. Nevertheless, Mr. Walter voluntarily pays $250 per month child support. The debtor omitted that sum from the original Chapter 13 Statement, explaining that since it was not taxable as income, she believed it was not includable as income for Chapter 13 purposes. To compensate for the omitted child support, she also omitted from the budget portion of the Chapter 13 Statement certain expenses attributable to the children. She has since filed an amended budget which shows the child support and includes the increased expenses.

The creditors do not believe that explanation is credible, noting that question 3(a) of the chapter 13 statement specifically asks if the debtor receives "alimony, maintenance or support." The debtor explained that she interpreted the question as referring to spousal support rather than child support. The court finds that explanation credible. During a rule 2004 examination of the debtor, when the subject of child support came up she readily disclosed the payments by Walter. If she intended to deceive, then it is not likely that the debtor would volunteer the very information she is accused of concealing. As shown by the amended budget, expenses equivalent to the omitted support payments were not listed on the original chapter 13 statement. The court concludes that the debtor's omis-

sion of the $250 was an error rather than an intentional attempt to deceive the court or creditors as to her income.

### B. Expenses

■ Here again we face a question of the burden of proof. The creditors argued strenuously that the burden is on the debtor to show good faith by establishing the reasonableness of every single budget item, even if no evidence suggests that a particular item was unreasonable. However, Bankr.R. 3020(b)(2), discussed *supra,* recognizes that a debtor should not be obligated to meet every argument that could possibly be made against a finding of good faith, even if no such argument is presented. To require the debtor to engage in that type of shadow-boxing is a waste of time and resources.

The debtor need not go through each budget item and offer proof that it is a reasonable projection of future income or expenses. If the creditors believe that a particular budget item is unreasonable, it is incumbent upon the creditors to specify the objectionable item so that the debtor may meet the issue.

■ The only item which the court believes should be adjusted is heat. Historically, the debtor's average monthly electrical expense was approximately $50, rather than the $80 projected by the debtor. In the event that the expenses for heat are at the higher figure, then the debtor may file a modified budget and plan reflecting that fact.

The court finds nothing particularly sinister in the debtor's listing heat at $80 per month. Paragraph 4(b)(2) of the Chapter 13 statement calls for *"estimated* average *future* monthly expenses...." (Emphasis added.) Thus, the debtor is called upon to predict future expenses rather than list historical averages.

The creditors point out that the debtor's annual income is approximately $7,000 more than when she was in school, and therefore questions that she can only afford to pay $1,320 per year to creditors. However, the debtor's standard of living in law school was marginal. The Code does

not require that chapter 13 debtors live in abject poverty.

The standing trustee, who has occasion to examine thousands of chapter 13 budgets annually, recommended confirmation of the plan. That fact underscores that the amended budget proposed by the debtor is reasonable. The creditors thoroughly examined the debtor's records and examined her at length regarding the projected budget. The only questionable expense is heat, which exceeds historical expenses by $30. That does not strike the court as signifying a determined effort to inflate expenses.

The court concludes that the debtor has done her best to accurately reflect future expenses. Except for an excess of $30 per month for heat, there is no evidence that any items are excessive or unreasonable.

## INTENT OF DEBTOR AT THE TIME DEBT INCURRED

 The creditors assert that when the debtor obtained some of the loans in question, she planned to discharge them in bankruptcy rather than repaying them. If that were proven, this court would have no problem finding that this plan, and any other proposing to discharge such loans, was not proposed in good faith. However, the creditors have not shown that fact.[6]

 The debtor lived frugally during the period she was being supported by the student loans. She often had insufficient money to adequately heat her residence. She depended upon donated food and clothing to help feed and clothe her children.

The debtor testified that she fully intended to repay the loans at the times she borrowed the money, and the facts support that testimony. There is no evidence that the debtor knew about the dischargeability of student loans when she incurred the debt at issue. While in law school, and despite her severe financial distress, the debtor borrowed less than the full amount for which she was eligible. If she did not intend to repay the debt, one would expect that the debtor would have accepted all the financial assistance available through student loans and other lenders.

After graduation, the debtor inquired about consolidating or otherwise restructuring her student loans, thereby reducing the monthly debt service. She was advised that after consolidation, her monthly payment would be $450 per month, an impossibility on the debtor's salary as a deputy district attorney. No feasible options were presented to the debtor.

The fact that student loans are the *only* debts is strong evidence of good faith in proposing the plan. If the debtor intended to manipulate the Bankruptcy Code by incurring debt with the intent to discharge it at a later date, then one could logically expect to see evidence that the debtor took advantage of the availability of credit to the fullest extent. That is not the case here, as shown by the lack of any debt other than student loans.

## LUXURY PURCHASES

 The creditors suggest that at a time when her loans were starting to become payable, the debtor was living an extravagant lifestyle. The following summarizes the expenditures complained of by

---

6. The creditors make much of the fact that the debtor should have realized early in her law school career that she was unlikely to obtain high-paying employment. The inference is that before accepting any of the loans, the debtor should have carefully weighed the probability of her future ability to repay the loans. If it appeared that she would be unable to do so, she should have withdrawn from school, presumably to return to her prior employment as a bar maid.

That premise is difficult for this court to accept. Student loans are granted on the basis of present need rather than future ability to repay. Repayment is ultimately dependent upon the total amount borrowed during the course of the debtor's education and the future employability of the debtor, both of which may be difficult to predict at the time a loan is taken. There is no evidence that the debtor misrepresented her outstanding indebtedness or her ability to repay the loans upon graduation. In fact, there is no evidence that they were factors into which the creditor inquired. If the lender did not deem it important to evaluate the debtor's future ability to repay her debt, it is difficult to expect the debtor to do so.

the creditors, along with other relevant circumstances:

In the Spring of 1988, the debtor graduated from law school. She and her two daughters shared a small two-bedroom apartment costing $350 per month. The children had reached an age where sharing a bedroom was causing conflicts. To resolve the problem, the debtor moved to a three-bedroom apartment close to the children's school. As of the confirmation hearing, the rent was $485 per month, which the trustee did not find objectionable.

By September of 1988 the debtor had taken the bar examination and obtained employment with the Multnomah County District Attorney. In the Fall of 1988 she started receiving demand letters from the lenders. She consulted an attorney, who advised her that a chapter 13 case might be appropriate.

The debtor elected not to file a bankruptcy petition at that time, explaining that she was hoping there was some other solution. At that point, all her loans had not yet become payable, and she was still not sure what the monthly debt service would total.

Her employer had a dress code which required the debtor to present a professional appearance. Therefore, during this period the debtor began establishing a work wardrobe. She wanted clothes that would last, and shopped at higher-quality stores. By January, 1989 she had spent at least $1,060 on work clothes.

In March of 1989, the debtor replaced her broken stereo system by purchasing a tape deck and receiver for $790.00. The stereo and tape system were the primary source of entertainment for her children, and she wanted equipment that would last.

The creditors point to a "vacation" taken by the debtor in 1989 at Sunriver, Oregon. That "vacation" was a professional conference. The debtor, five other deputy district attorneys and four children all stayed in the same residence. The conference enabled the debtor to fulfill her mandatory continuing professional education. While attending that conference the debtor and her children spent money on a raft trip.

The creditors also object to some other minor expenses, such as $150 for picture and frames. All the above items, taken either individually or collectively, are too insignificant for the court to seriously consider as evidencing a lack of good faith.

After all is said and done, the most damning evidence of a lack of good faith consists of an expensive stereo, some nice work clothes and an overestimate of $30 for heat. The court doubts that Congress intended that to be a basis for denying the debtor the relief she so greatly needs.

CONCLUSION

The matter of disposable income covered by § 1325(b) establishes a mathematical equation under which the dividends to creditors will follow. Therefore, the amount of the dividend to creditors is no longer an appropriate consideration in determining good faith. Likewise, since § 1328(a) legislatively defines what debts are dischargeable, whether or not the plan contemplates the discharge of a debt which would not be dischargeable in a Chapter 7 case is of little weight in determining good faith. Those cases which have varying laundry lists of factors which might be considered in determining good faith give no indication of the weight which should be attached to any single factor. Instead such cases seem to instruct the trial judge that the decisions can be made on an ad hoc, case by case basis which can depend upon the predilections of the judge before whom the case is pending.

Following these teachings and considering all militating factors as suggested by *Goeb*, supra, as they apply to the facts of this case, I find that the plan is proposed in good faith.

The plan should be amended as follows:

(1) the debtor shall pay an additional $30 per month to the trustee, for a total of $140 per month;

(2) the debtor shall pay to the trustee any income tax refunds to which she may be entitled during the life of the plan;

(3) the debtor shall submit quarterly reports of income and expenses to the trustee and objecting creditors.

(4) paragraph 1 of the plan should be amended to reflect that plan payments shall be for a 36 month period;

(5) paragraph 2(d) of the plan should be amended to state that the dividend upon nonpriority unsecured claims will be not 4% but approximately 4%. (The exact percentage will depend upon the total amount paid by the debtor to the trustee during the 36 month period and the total amount in which the nonpriority unsecured claims are filed and allowed).

An appropriate order will be entered.